## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**DEBRA WILLIAMS**

                                              **CIVIL ACTION**

**VERSUS**

**BANKERS LIFE & CASUALTY COMPANY;**
**CNO FINANCIAL GROUP,  INC.**


                                             **TRIAL BY JURY**

### COMPLAINT

### JURISDICTION AND VENUE

1.

Plaintiff invokes this Court's jurisdiction pursuant to 42 USC § 2000e-5 and 28 USC § 1343(4).

2.

Venue is proper in this court because the alleged unlawful employment practices occurred within the Middle District of Louisiana.

### PARTIES

3.

Plaintiff is a citizen of the United States and a resident of East Baton Rouge Parish, Louisiana.

4.

Plaintiff is an African American woman whose date of birth is March 18, 1958.

5.

Defendant, Bankers Life & Casualty Company ("Bankers") is a wholly owned subsidiary of the CNO Financial Group, Inc. ("CNO"). CNO provides health and life insurance, as well as retirement solutions, to middle-income Americans through its family of insurance brands: Bankers Life, Colonial Penn and Washington National. CNO employs 3,000 associates and has in force over 3.2 million policies. http://cnoinc.com/media/237939/198259_cno_fact_sheet_0720_final.pdf

6.

Bankers' business organization and management structure consists of branch locations in a number of cities across the United States. Management positions at each branch includes a Branch Sales Manager("BSM"), one or more Unit Sales Managers("USM"), one or more Unit Sales Supervisors("USV"), one or more Unit Field Trainers("UFT"). Persons in these positions are Bankers employees.

7.

Each Bankers branch has a number of agents who are independent contractors and who are under the supervision of Bankers management.

8.

The United States is divided into four Bankers Territories. Each Territory has a Territory Vice President.

9.

Each Territory has one or more Regions. Each Region has a Regional Director.

10.

The branch offices involved in this lawsuit are the Jackson, Mississippi branch (#2065) and the Baton Rouge, Louisiana branch (# 4062).

11.

The Jackson branch is in the 4161 Memphis Tennessee Region. The Regional Director is Perron Shoemaker.

12.

The Baton Rouge branch is in the 4017 Houston S Texas Region. The Regional Director is Christopher Cooper.

13.

Both Regions are in the South-Central Territory. The Territory Vice President is Robert Birty.

## ADMINISTRATIVE PROCEDURES

### 14.

Plaintiff filed a charge of employment discrimination with the District Office of Equal Employment Opportunity ("EEOC"). Charge Number 461-2020-01555. On March 23, 2021, The EEOC issued a right to sue letter to the plaintiff.

## STATEMENT OF FACTS

### 15.

Williams began her career with Bankers in June, 2005.

### 16.

At that time, Williams was employed at another insurance company. Charles Smith, a Bankers employee, approached Williams about coming to work for Bankers. Smith explained the opportunities and income potential available to Bankers associates. Williams agreed and went to work as an independent contractor authorized to sell Bankers products.

### 17.

At that time, Williams resided in Jackson, Mississippi.

### 18.

A few months later, Williams requested a transfer to the Baton Rouge, Louisiana branch.

19.

Williams request to transfer was approved and Williams was assigned to Bankers' Baton Rouge branch.

20.

Williams was a highly productive employee during her career with Bankers.

21.

From 2006-2019, Williams was the top Bankers agent in the State of Louisiana. Williams was the only Bankers agent in Louisiana who had a car decal that displayed her photograph and Bankers logo which advertised Williams as a Bankers agent. Williams was known and recognized as a Bankers agent throughout the state of Louisiana.

22.

Williams was occasionally featured in company publications in a family of companies which is heavily dominated by white men.

23.

Williams was routinely honored and recognized as one of the top Bankers agents. Williams was featured in the 2010 Salute to Women in a Business special edition of Greater Baton Rouge Business Report magazine. Her affiliation and dedication to Bankers was widely respected around the state of Louisiana. Williams was invited to speak at many churches and Council On Aging Centers around the

state. Williams also participated in the annual Life After 50 Expo held at the River Center on several occasions  as an Exhibitor representing Bankers.

24.

Williams made several cruises and trips abroad with Bankers  and CNO upper management.

25.

In 2009, Williams was selected out of 4000 Bankers agents to represent Bankers and to make a presentation at the American College Annual Conference which was held at Howard University Washington, D. C. Williams was featured in the 2009 program brochure as the speaker representing Bankers.

26.

In 2010, Williams was the first Bankers agent who was allowed by management  to tape several television commercials for Bankers. The commercials were aired on a local television station in Baton Rouge and viewed by thousands of people throughout the state of Louisiana.

**Williams' brain aneurysm**

27.

In July, 2015, Williams was diagnosed with a brain aneurysm secondary to being involved in a motor vehicle accident.

28.

The treatment for this condition involved three surgeries.

29.

The first surgery was in August, 2015 and the second surgery was in June, 2016. Although Williams was out of work for two months for each surgery, she maintained her status as the top Bankers Life agent in the state of Louisiana.

30.

In January of 2017, Williams underwent the third and final surgery in Houston, Texas.

31.

Williams returned to work in April of 2017 and once again, was the top Bankers Life agent in the State of Louisiana in 2017.

**Kevin Lemmon arrives in Baton Rouge**

32.

In 2017, the Baton Rouge branch was not meeting its performance goals. Bankers management made a decision to demote the current branch manager and to bring in a new manager.

33.

On August 28, 2017, Kevin Lemmon transferred to the Baton Rouge branch from the Saint Louis, Missouri branch. He was promoted to the BSM position.

34.

Lemmon was allowed to bring his existing book of business with him and he continued to earn money from production generated by his clients living in the Saint Louis service area and also in the Houston, Texas service area.

35.

Lemmon also received a financial package associated with his new position as branch manager.

36.

A short time after Lemmon became the branch manager, the Unit Sales Manager ("USM") position became open due to the departure of the employees serving in that position.

37.

The Baton Rouge branch performance continued to be below management's expectations in 2018 and 2019.

**Williams' monthly sales seminars**

38.

In August of 2018, Williams developed an informational seminar to promote the sale of Bankers' products.

39.

Williams presented the concept of the seminar to Lemmon and Lemmon approved of it.

40.

The seminar was held on the last Saturday of the month at the Baton Rouge branch office.

41.

The presentation was open to the public as well as to prospective and existing clients and was also open to Bankers agents and employees.

42.

Williams covered all expenses of the seminar, including printed materials, the mailing of invitation cards, snacks, beverages, and a complimentary lunch.

43.

At the monthly seminar, Williams presented information concerning the products offered by Bankers as well as guidance on Bankers' marketing strategy.

44.

Williams conducted the seminar in each month from August, 2018 through February, 2020. Williams was praised for her success in bringing people into the branch office, signing them up as new clients, and increasing sales

.

## Unit Sales Manager ("USM") position in the Bankers business model

45.

The job duties and responsibilities of the Unit Sales Manager ("USM" )  in the Bankers business model are to assist the Branch Manager in meeting the  goals established for the branch by upper  management. The USM focuses on recruiting new agents, training and developing the new agents, and meeting sales production goals each year. The USM must know how to write and close business, how to recruit and train agents, and must also manage a group of agents assigned to the branch.

46.

The USM position at the Baton Rouge branch remained open for an extended period of time.

47.

Williams was the only agent in the Baton Rouge branch with the necessary qualifications to serve as USM.

48.

In 2019, Williams volunteered to serve in that position.

49.

Lemmon advised the Regional Director, Christopher Cooper, of Williams' interest in the USM position.

50.

Cooper came to Baton Rouge to meet with Lemmon and Williams.

51.

On this occasion, Cooper, Lemmon and Williams went to lunch. In this conversation, Lemmon praised Williams' job performance.

52.

Cooper encouraged Williams to talk about her ideas to grow the branch.

53.

Cooper said that Williams knows how to close business, that she knows how to train agents, and that she knows how to assist agents to increase their production. Cooper said that Williams had done a lot for Bankers and that Williams should get more recognition for her job performance.

54.

Cooper also asked about William's health. Cooper asked Williams if she was up to the demands that would come with the USM position.

55.

Williams said that her health was good and that she sees her doctor once a year for follow up. Williams said that she was ready for the challenge.

56.

Cooper then said that the plan would be to promote Williams first to Unit Field Trainer ("UFT") and then to USM.

57.

Cooper said that the Baton Rouge agents would have to get used to the idea of Williams coming into leadership. Cooper encouraged Williams to get in there do what you do.

58.

Cooper said that not everyone would be happy with Williams in leadership, but agent dissatisfaction would not be a problem.

59.

Cooper mentioned two employees, Lonnie Brewer and Brent Couvillion, who would think that they should have been promoted but stated that neither of them had the necessary qualifications.

**Williams hired as Unit Field Trainer**

60.

On August 16, 2019, Lemmon hired Williams to be a Unit Field Trainer ("UFT") in the Baton Rouge branch office.

61.

The Regional Director, Christopher Cooper, approved of the decision to hire Williams as UFT.

**Williams promoted to Unit Sales Manager(" USM")**

62.

On October 16, 2019, Lemmon promoted Williams to Unit Sales Manager ("USM") in the Baton Rouge branch office. Williams was given the entire team of agents and UFTs in her downline to manage.

63.

The Regional Director, Christopher Cooper, approved of the decision to promote Williams to USM.

64.

Lemmon made the announcement of Williams' promotion in a meeting of all the branch agents and staff.

65.

Two employees, Lonnie Brewer and Brent Couvillion, left the meeting. Both employees were Unit Field Trainers. Brewer left the building in a huff.

66.

Brewer and Couvillion apparently believed that they should have been promoted to USM.

67.

Apparently, neither Cooper nor Lemmon advised Brewer and Couvillion ahead of time that Williams would be promoted.

68.

Lemmon left the meeting and went to speak to Brewer and Couvillion. Williams remained in the conference room with the other agents for a short time and then Williams concluded the meeting.

68.A.

A short time later, Williams went looking for Lemmon. Williams found Lemmon alone and looking sad in another conference room.

68.B.

Lemmon told Williams that Brewer had left the building and that Brewer might not come back.

68.C.

Lemmon then told Williams that "No one wants to work for a black woman named Debra".

68.D.

Williams was shocked and speechless. She walked out the room with no comment. Shortly thereafter, Williams sent a text message to Lemmon stating that

she was leaving work at 5:30 p.m. with a headache and needed to process what had happened that day.

## 69.

In December of 2019, Cooper saw that Williams' monthly seminars were successful in generating new business. Cooper asked Williams to send him the template of Williams' seminar PowerPoint presentation so he could share it with other managers in his region.

## 70.

Williams sent the template to Cooper as Cooper had requested.

## 71.

The Branch Sales Manager("BSM") of the Jackson, Mississippi branch, Thomas Birkhead also heard of Williams' seminar. Birkhead asked Lemmon if Birkhead could attend.

## 72.

Lemmon asked Williams if Birkhead could attend.

## 73.

Williams said yes and invited Birkhead to the January 2020 seminar.

## 74.

Williams mailed an official written seminar invitation to Birkhead and to Charles Smith at the Jackson office. Smith was an agent in the Jackson office, and

he was the person who recruited Williams to come to work for Bankers. Smith acknowledged receipt of Williams invitation card and stated that he would try to attend with Birkhead.

75.

Birkhead and Smith were unable to attend the January seminar.

**Williams requests information about the transfer process**

76.

In early 2020, Williams made a decision to relocate to Jackson, Mississippi to be near her family. Having been employed by Bankers Life for over 15 years, Williams was familiar with all of the company's policies and procedures. Williams knew that employees were routinely permitted to transfer between branch locations. Williams had transferred to Baton Rouge from Jackson in 2005 without any problem.

77.

At this time, the Bankers Territory playbook report showed that there was an opening for a USM at the Jackson branch.

**Events of March 9, 2020**

78.

On the morning of March 9, 2020, Williams sent an email to Human Resources requesting information about the transfer process.

79.

Williams also sent an email to Lemmon indicating that she was relocating for personal reasons.

80.

On this date, after reading Williams' email, Lemmon erroneously thought that Williams was resigning. Williams' email clearly had a subject title of "relocating" not resigning. Lemmon relayed this erroneous conclusion to the Regional Director, Christopher Cooper.

81.

Cooper concurred in Lemmon's erroneous conclusion. Cooper directed Lemmon to contact CNO Human Resources Director, Jeremy Loos, and to schedule a conference call for later that same day.

82.

Later that same day, a conversation took place among Lemmon, Cooper, and Loos. The consensus reached by these white men was that Williams was resigning. None of these three white men suggested talking with Williams first to confirm that Williams was resigning. Cooper instructed Lemmon to terminate Williams' contract.

83.

On this date, Debra Williams sent a second email to Human Resources requesting instructions on the transfer process.

84.

On this date, after his conversation with Cooper, Lemmon sent an email to Williams asking her to call him ASAP.

85.

Thirty minutes later, Williams returned Lemmon's call. The call went to Lemmon's voicemail.

86.

Before noon that same day, Williams clarified that she was requesting information about a transfer and that she was not resigning.

87.

Around 4:00 p.m. that same day, Loos and Lemmon and Williams were on a conference call together. Williams was in Lemmon's office in the Baton Rouge branch office. Loos was on conference call speaker.

88.

Loos and Lemmon kept asking Williams if she wanted to quit the company. Williams response was: " I don't want to quit any  more than you want to quit. I love Bankers".

89.

 Williams was told that the transfer would not happen because there was no open USM position in the Jackson office.  Williams was told that if Williams desired

to relocate to Mississippi, her choices were to remain assigned to the Baton Rouge office as a USM or as an agent. There was no possibility of transferring to the Jackson office under any circumstances.

90.

Williams told them that she was sick to her stomach and went to the restroom and vomited.

91.

Williams returned to the meeting. Williams requested that they put whatever they wanted to say to her in writing because she was sick and she wanted to understand what they are telling her.

92.

Williams went to her office and sent an email to Lemmon and Loos requesting that they put what they were saying to her in writing.

93.

Loos sent an email to Williams and stated that the options were to remain assigned to the Baton Rouge office as a USM or "relocate with the understanding that there is no role for you to transfer into where you are going".

94.

At 8:53 p.m that same day, Williams sent an email to Lemmon with a copy to Cooper and to Laura Carbone. Carbone is the Bankers Territory Office Administrator.

95.

In this email, Williams complained that she was being treated unfairly when she was told that she had to resign or remain in Baton Rouge if she wanted to keep her job. Williams also stated that she knew that people relocate all the time.

**Events of March 10, 2020**

96.

On this date, Lemmon sent an email to Williams, Carbone, Cooper, and Loos.

97.

In this email, Lemmon stated that transferring between branches is not an automatic process and that it probably would not happen for several reasons. Lemmon did not state the reasons why the transfer would not happen and referred to Loos' earlier email. Lemmon stated that Williams' options were to remain assigned to the Baton Rouge office either as a USM or as an agent.

98.

The fact that Williams was relocating to Jackson, Mississippi made no difference whatsoever to Lemmon and Loos.

99.

In the march 9 conference call, Loos asked Lemmon what his expectations were for Williams if Williams remained the USM in the Baton Rouge office. Lemmon responded that he expected Williams to be in the office at least three days a week.

100.

It is a six-hour drive round trip from Baton Rouge to Jackson.

**Events of March 11-17, 2020**

101.

Williams continued to carry out her regular assignments as USM in the Baton Rouge office. Williams took one sick day for a doctor's appointment.

102.

During this time, Lemmon was rude and unpleasant to Williams. Lemmon let the whole office know that he was upset with Williams. Lemmon told Williams that "she was making people mad". Lemmon pestered Williams to make a decision.

103.

During this time, Williams complained to Lemmon that he was being unfair and discriminatory.  Williams also sent  an email to Lemmon with a copy to Loos, Carbone and Cooper  stating that she felt disrespected, pressured, and treated unfairly.

104.

Following Williams' email, Lemmon could tell that Williams was stressed out and not feeling well. Lemmon attempted to distance himself from Williams' situation by telling   Williams that anytime HR is involved, the matter is out of his hands.

## Events of Wednesday March 18, 2020

105.

On this date, Williams arrived at the Baton Rouge office at 7:00 a.m. Williams had seven interviews with prospective new agents scheduled for that day starting at 8:00 a.m. Williams punched in the code to unlock the door. The door did not open. The code had been changed.

106.

Williams sent a text message to the Baton Rouge management (BSM and the three UFTs) on GROUPME asking for the code to the door. No one responded.  The UFTs, Lonnie Brewer, Brent Couvillion. and Michele Wiley were in Williams' downline. Williams was their supervisor.

107.

Williams asked Lemmon for the new code. Lemmon refused to give Williams the new code. Williams waited outside the office until Lemmon arrived at 8:00 a.m.

108.

Lemmon told Williams that he had changed the code so that Williams could not get inside the office and steal Bankers property.

109.

Lemmon instructed all managers and agents not to share the office code with Williams.

110.

Williams sent Lemmon an email expressing her surprise that Lemmon had changed the code on the door and also refuting his charge that she would steal Bankers property. Williams stated that she was offended by Lemmon's baseless allegation. Williams concluded by stating that she would confine her workday to Lemmon's hours of 8:00 a.m. to 5:00 p.m.

111.

Lemmon did not respond to the email.

112.

Lemmon never denied that he called Williams a thief prior to Bankers' lawyers getting involved in this case.

113.

Around 11:30 a.m. that same day, Williams left the office for lunch. Lemmon sent Williams an email at 11:36 a.m., complaining that Williams had left the office without checking out with anyone. Lemmon copied Cooper and Loos with the email.

114.

Prior to this event, Williams had not been told by Lemmon that he expected her to check out with anyone when she left the office.

115.

At this point, Lemmon and others were actively devaluing Williams as a manager and employee in the following ways. The code had been changed on the office door. No one gave Williams the code at the time the code was changed. No one furnished the code to Williams in response to her request for the code. Everyone in the office knew that Williams did not have the new code. Lemmon accused Williams of being a thief. Lemmon sent an email to Williams with a copy to Cooper and Loos complaining of Williams leaving the building without checking out with anyone.

116.

It was obvious that Lemmon disapproved of Williams' desire to transfer to Jackson and it was also obvious that Lemmon was building a paper trail to fire Williams.

117.

All of this negative blowback from management was in direct response to Williams request for information about the transfer process.

118.

Since nothing was happening about Williams' request for information about the transfer process, Williams decided to contact the Jackson branch Manager, Thomas Birkhead. Williams spoke with Charles Smith, a Bankers employee in the Jackson office, and told him that she was trying to relocate to Jackson and asked for the phone number to call Birkhead. Smith said he would tell Birkhead to expect Williams' phone call.

119.

On the evening of that same day, Williams called  Birkhead. Williams told Birkhead that  she was moving to Jackson and that she wanted to meet with Birkhead to discuss working in his office.

120.

Birkhead stated that he had seen Williams' numbers in the Bankers playbook and that he would be happy to have Williams in his office if Lemmon says that Williams is "in good standing". Birkhead said to call him back on the following Friday.

121.

At around 8:00 p. m. that same day, Williams consulted the Bankers website and located a form to request a transfer.   Williams followed the steps outlined to request a transfer.   Williams sent an email to the Territory Office Administrator, Laura Carbone and she copied Lemmon and Birkhead on the email as instructed in the information obtained from Bankers' website.

122.

Sometime that same evening, Cooper called Williams. Williams sent a text: sorry I missed your call.

123.

Cooper responded by text: No worries, it's not urgent. I've been following your email string. Just wanted to touch base over the phone so I can get everyone's full perspective.

**Events of March 19, 2020**

124.

At 8:30 a.m., Williams texted Cooper and stated that she is available to call if this is a good time.

125.

Cooper responded: call me at 8:50. Please.

126.

At 8:50 a.m. Williams called Cooper.

127.

In this conversation, Williams complained about Lemmon changing the code on the office door. Cooper responded that it was routine to change locks when they thought someone was quitting. Williams responded that management knew within an hour of receiving her March 9, 2020 email that she was not resigning.

128.

Cooper said that they were bending over to help Williams because Williams has been with Bankers for fifteen years. Cooper said that he had been watching from a distance but felt that it was time to call Williams. Cooper said that Williams was in good standing and that there is nothing to prevent Williams from transferring.

129.

Williams told Cooper that she had spoken to Birkhead and that Birkhead said that he had seen Williams numbers on the Playbook report and that he would be happy to have Williams. Birkhead said that he would   contact Lemmon to make sure that Williams is in good standing.

130.

Cooper told Williams to send an email to the Regional Director, Perron Shoemaker, and to copy Cooper on the email.

131.

Williams immediately sent the email as Cooper had directed.

132.

Williams felt relieved that the two Regional Directors (Cooper and Shoemaker) were now involved and hoped that the transfer process would now go smoothly.

133.

At 12:30 p.m. that same day, Williams went to the conference room in the Baton Rouge office for the regularly scheduled meeting with the Unit Field Trainers("UFT") and the BSM, Lemmon.

134.

No one was in the conference room.  Williams waited for around fifteen minutes and then went to Lemmon's office. Lemmon was not in his office.

135.

Williams continued to search the building and found Lemmon and the three UFTs holding the meeting in another room in the office.  Williams asked:" Is this a private meeting?"  Lemmon said: "Come on in". Williams took a seat. Lemmon spoke for a few minutes about nothing important and the meeting ended.

136.

At 1:45 p.m. Shoemaker called Williams.  Shoemaker told Williams that he had spoken to Cooper. Shoemaker said that Cooper told him good things about Williams and that he was looking forward to setting up an interview with Williams at Shoemaker's office in Memphis as soon as "territory or Kevin would allow Williams' transfer paperwork."  Shoemaker knew about the seminars that Williams was producing in Baton Rouge and that he looked forward to assisting Williams with conducting seminars in his region.

137.

Shoemaker ended by saying that he would contact Williams as soon as he finds out something.

**Events of March 24, 2020**

138.

At 9:00 a.m. Williams called Shoemaker to follow up on the transfer. Shoemaker told Williams that he had not heard anything from territory and that he "does not know what is going on or why it is taking so long". Williams told Shoemaker that she felt like she was being mistreated, harassed, and bullied by Lemmon and Loos. Williams told Shoemaker that Lemmon and Loos had scheduled another conference call. Williams said that these conference calls were stressful with no purpose.

139.

Shoemaker said that there was nothing that he could do and that Williams should talk to Lemmon and Loos.

140.

At 2:00 p.m. Williams joined the conference call with Lemmon and Loos. Williams was asked why she called Birkhead. Williams was told that Birkhead denied telling Williams that she could be a manager in the Jackson office and that she was telling a lie.

141.

Williams said that she had not discussed any specifics with Birkhead.But at the same time, Williams said why would Birkhead compliment her about her numbers and about her seminars and her performance as a USM if Birkhead's only interest was in Williams coming to Jackson as an agent?

142.

Williams was again accused of telling a lie.

143.

Williams was asked why did she send the email to Carbone. Williams said that she was following the procedure that she found on the Bankers website. Loos asked Williams to send him the link. After the call ended, Loos sent an email requesting the link.

144.

Williams searched for the link but could not find it. Williams sent an email to Loos describing her efforts to locate the link.

**Events of March 31, 2020**

145.

Williams was notified by email of another conference call with Loos and Lemmon to be held on April 1, 2020.  Williams experienced an upset stomach, elevated blood pressure and anxiety.

146.

At 2:30 p.m., Williams called Shoemaker and asked him why another conference call was scheduled with Loos and Lemmon. Williams told Shoemaker that she was stressed out and that she needed help. Williams told Shoemaker that she was being treated unfairly and was being discriminated against.

147.

Williams said that Bankers people transfer all the time.

148.

Shoemaker agreed and said that a transfer never takes this long, and that Williams was being treated unfairly.

149.

Shoemaker said that he would notify Loos and everyone else about how Williams was feeling.

150.

The conversation lasted thirteen minutes.

151.

Williams notified Loos by email that she was not available on April 1, 2020 and requested a postponement until the following week.

152.

Loos responded that the call was mandatory and rescheduled it for April 2, 2020.

**Events of Wednesday, April 1, 2020**

153.

At 3:37 p.m., Williams called Shoemaker and left a message on his voicemail.

154.

A short time later, Shoemaker called Williams.

155.

Shoemaker said that he notified Lemmon and Loos about how Williams was feeling.

156.

Shoemaker said that Williams cannot avoid talking to Loos and that he did not know what Loos and Lemmon would say to Williams when they spoke to her the next day.

157.

Shoemaker told Williams to call him after the conference call. Shoemaker said that he understood Williams' stress but that he could not do anything.

**Events of Thursday, April 2, 2020**

158.

Early that morning, Williams called Cooper and left a voice message that she was in distress. Cooper did not return the call.

159.

At 11:46 a.m. Williams sent an email to Cooper asking for his help to end this process. Williams told Cooper that she was feeling harassed, bullied and disrespected by Loos and Lemmon and that she was upset about the treatment she was getting from them.

160.

At 12:43 p.m. Williams called Shoemaker. Williams told Shoemaker that the process was unfair and that she was sick and stressed out. Shoemaker offered no

assistance. Shoemaker told Williams to call him after the conference call with Lemmon and Loos.

161.

At 1:00 p.m. Williams joined the conference call with Lemmon and Loos.

162.

Williams was informed by Lemmon and Loos that her employment was being terminated effective immediately because:

a)    Williams did not provide the link from the website;

b)    Williams lied about her conversation with Birkhead;

c)    Williams sent a false email to Carbone;

d)    No position was available in Jackson;

e)    Williams was disregarding their directions.

163.

At 1:17 p.m. Williams called Scott Goldberg, President of Bankers Life. The call went to voicemail. Williams did not leave a message.

164.

At 1:22 p.m. Williams sent a text message to Goldberg informing him that she had been terminated and asking for his help. The following is a verbatim reproduction of the text conversation:

Williams: Good afternoon Scott, this is Debra Williams in Baton Rouge. I have been terminated and I would like to ask for your help.

Williams: Scott, I have been the top producer in Baton Rouge for 15 years and for personal family reasons I requested a transfer to Mississippi and now I am terminated because of that. And I need your help...Please,

Goldberg: Debra, thanks for reaching out. I'm not familiar with what has happened. I have reached out to your TVP Bob Birty. Have you?

Williams: No, I talked to Chris Cooper and he seemed ok with my request to relocate and he told me to email Perron Shoemaker, and I did. But HR and Kevin keep scheduling intimidating and interrogating conference calls with me. And today they said I will be terminated effective immediately because I did not follow their instructions.

Goldberg: What instructions?

Williams: On the first conference call HR and Kevin Lemmon told me I had 2 choices that I could quit the company or I could transfer as a agent and continue to report to Kevin in Baton Rouge. I asked them to put it in writing and they have been pressuring me to decide which option. Kevin locked me out of the office 2 weeks ago so I could not

have access to the building but he continue to give me responsibilities of recruiting and conducting second interviews by telephone.

Goldberg: Who from HR?

Williams: Jeremy Loos.

Goldberg: Let me wade in.

Williams: Thank you so very much.

Williams: I am so distraught. Never in 1 million years would I think I would be fired from Bankers Life.

Goldberg: Debra, Bob Birty will call you tomorrow.

Williams: Thank you, Scott.

Goldberg: Thanks Debra, I look forward to hearing from Bob after you two talk.

### 165.

At 1:39 p.m.  Williams called Shoemaker. Shoemaker was shocked to hear that Lemmon and Loos had fired Williams.  Shoemaker said that he was sorry that all of that had happened. Williams was too upset to say much of anything.

### 166.

Within minutes of getting off the phone with Williams, Shoemaker called one or more persons about the discriminatory treatment  Williams was receiving from Bankers' employees.

167.

Later that afternoon, Williams received an email from Loos  which enclosed a letter notifying Williams that her employment was terminated. No reason was given in the letter for the decision to terminate Williams' employment.

### Events of  Friday, April 3, 2020

167.A.

Birty called Williams and the call went to voicemail.

The following is a verbatim transcript of the text message conversation  between Williams and Robert Birty which occurred on April 3, 2020:

> Williams: Mr Birty, This is Debra Williams, I appreciate so very much that you reached out to me today. I am too upset to talk rationally. I have never been fired from any job and I am very devastated and unable to talk without crying. May I call you on  Monday please?
>
> Birty: Hi Debra. Thanks for getting back to me and I understand. Yes, you can call me on Monday.

### Events of April 3-5, 2020

168.

Williams was emotionally traumatized. She cried repeatedly. Williams experienced pain in her head and stomach.

169.

On Sunday evening, Williams typed out a narrative of events to present to Birty on Monday.

## Events of Monday, April 6, 2020

170.

At 8:35 a.m, Williams texted Birty  that she was emailing a document.

171.

The following is the verbatim text of the narrative Williams sent to Birty:

Nobody knows what I have been through 15 years enduring changes, challenges, struggles in Louisiana without a mentor.

Family and personal problems caused me to have to move and relocate to Mississippi. I told Kevin that I had family and personal issues going on the week prior to given him the letter to transfer/ relocate.

Outlined below are actions and events in chronological order.

1.1 emailed HR and asked for steps to take when wanting to transfer due to relocation. Jeremy Loos said he never got it, but the email is in my sent folder.

2. I sent the letter to Kevin on Sunday 3-8-20 stating my intent to relocate immediately because my personal situation had worsened and

had me driving back and forth and  I was exhausted. I had to put me and my family first.

3. I missed a call from Kevin on Monday morning 3-9-20 about 10:00 a.m. and before I could call him back, he contacted HR to end my contract. (less than an hour) The subject line of my email was relocating, not resigning.

4. A telephone conference call happened that afternoon, and Kevin and Jeremy with HR said I had 2 choices. I could quit the company or I can become an agent and stay assigned to Baton Rouge branch. I clearly told them that I was not quitting Bankers Life but I wanted to relocate and transfer to the Mississippi office. They said it would not happen, there was no position open in Mississippi for USM. I asked for it in writing and Kevin sent me a recap email saying my transfer to Jackson probably would not happen. They were pressuring me for an answer. The call ended with me asking to see it in writing so I could be clear on the details.

5. I continued to work and do my job. I was told that 8 telephone interviews were scheduled for me to conduct with recruits from 9:00 a.m. until 11:00 a.m. I completed the interviews, scheduled 3 of them for meetings in the office and left for lunch, (email sent from Kevin)

6.      I was waiting in the conference room for our regularly scheduled 12:30 managers meeting and Kevin took the meeting with the UFTs to another office and he did not tell me. He left me sitting in the conference room waiting.

7.      On 3-18-20 Kevin said he changed the locks on the office door so I could not get in and take Bankers property. He said I made a lot of people mad with me.

Out of frustration and desperation when not being allowed to transfer to Mississippi office and for lack of help and direction, I did 3 things that same day on 3-18-20.

A)      I called the Jackson Branch and spoke with Tom Birkhead. He said my numbers look good, my team doing good, He would be happy to have me, but would call Kevin first and make sure I am in good standings. He said call him back on Friday. Tom never did mention me coming as an agent or what positions were available or not. We never discussed demoting me to an agent. I assumed I would meet him and have an interview of my skills and abilities and track record.

(In February 2020, Tom asked Kevin Lemmon to visit Baton Rouge office and attend my monthly Long Term Care and Annuity Seminar to

see how Debra Williams does it. So why would I think he would demote me and take me out of a management position.)

Afterwards, I spoke with the regional director, Chris Cooper who directed me to Tom's boss, Perron Shoemaker, I thought I was supposed to let the RDs handle it from there. So, I did not call Tom Birkhead back.

B)    I searched the BSPN and found instructions on how employee transfers work, so I followed the steps under "If employee is requesting a transfer" (that sounded like me) and I followed the steps exactly as outlined on BSPN.

C)    I emailed Kevin Lemmon and Jeremy back expressing my frustration.

8.    When Chris Cooper saw the email, he called me and said he had been following the email chains and felt it was time to reach out to me. Chris understood and it felt like I had his blessings. He instructed me to email Perron Shoemaker and copy him on the email. I was relieved knowing that the regional directors are now involved and hopefully something would happen. I explained to Chris that I had spoken with Tom Birkhead in the Jackson office. I was not trying to hide anything. I told him that Tom said he would be happy to have me if Kevin said I

was in good standings. Tom never did say anything about demoting me to an agent. Why would he if he was impressed with my performance and numbers at that point, before talking to Kevin?

9)    Perron Shoemaker called me and after talking about my position, he said he would reach out to territory and see if I could transfer as some level manager. He told me to give him time to work it out. I called him a few days later to let him know that HR (Jeremy) wanted me on another conference call with HR, Kevin Lemmon, Chris Cooper.

He said let him know the outcome. Perron also stated that he spoke with Chris Cooper and he had all good things to say about me. He said everyone who he talked to had nothing but good things to say about me.

10)   The conference call happened with HR and Kevin, but Chris Cooper did not attend the meeting. I was questioned for 40 minutes as if I was being interrogated on a witness stand. I was intimidated, embarrassed, humiliated and felt harassed with questions of why did I do this and why did I do that. What did Tom Birkhead say and why did I not ask Kevin before I called another branch manager, and who gave me authority to email the TOA?

11)    I reported back to Perron Shoemaker about the call. I expressed my feeling of the treatment I was receiving. Perron said he would call or email HR and convey my feelings. He agreed that this process is going on too long. He did not know why. He also said he had not gotten an answer back from territory on my transfer request.

I did not hide any actions that I took because people were copied on my communications and surely should have seen my frustration. No I did not want to quit Bankers, and no I did not want to live 3 and a half (3.5) hours away from the office where I would have to report to. So, I wanted to report to Jackson, Mississippi. I have seen other managers transfer. Tom Birkhead mentioned that he transferred and there were problems but he was able to transfer. In 2016 a manager from Atlanta transferred to Baton Rouge as a USM and he did not have hassles. Kevin Lemmon transferred from St Louis to Baton Rouge as a manager. Why could I not transfer to Jackson and interview as a USM?    Why would my mind tell me I could not transfer? Why was I not allowed to interview with the Jackson branch when clearly there was no USM at the branch already? The unexpected termination of my contract is a total slap in the face, when someone could have helped me through the process better.

172.

At 11:00 a.m. that same day, Birty called Williams.  Here is Williams' recollection of the conversation with Birty:

1.      Birty said that Kevin did not follow the normal procedures for employee transferring.

2.      Birty said that instead of Kevin and Jeremy understanding what Williams wanted to do and figure it out, they felt that Williams was insubordinate and they drew a line in the sand and he(Birty)  is here to remove that line.

3.      Birty said that There "is enough blame to go around"

4.      Birty  said "let me explain the process". The BSM (Kevin) notifies the other branch of your request to transfer and an interview is set up. Williams was supposed to interview with Tom Birkhead or his boss Perron Shoemaker and he would have decided to accept me and explain the position details, number of agents in my downline, and any financial package which would have been requested for approval by the BSM. The paperwork is sent to the TVP for approval.

5.      Birty said Chris Cooper should have stepped in before the thing started going south. There was enough blame to go around.

6.    Birty asked Williams why she did not reach out to the RD, Chris Cooper. Williams said that everyone was copied on all the emails and that she thought that they all knew.

7.    Birty said that he was on my side. And that Williams should call him directly in the future.

8.    Birty said that he will contact HR and get me reinstated. Birty was not sure how long it would take. He said that the first thing is to get me reinstated even if it is as an agent. He said there is no USM in Jackson and no other managers and just a few agents so he did not understand why Tom would not want Williams help and it should not have been a problem.

9.    Birty told Williams to talk with Tom Birkhead and discuss coming to work in Jackson and Birty would get busy getting Williams reinstated.

## Events of Tuesday, April 7, 2020

### 173.

On this date, Birkhead called Williams.

174.

Williams recalled what Loos and Lemmon had told her about Birkhead's conversation with them, so Williams was understandably reticent in this conversation with Birkhead.

175.

Birkhead said that he had talked to Birty and that he understood everything that had happened to date.

176.

Birkhead said that Williams could come to his office in management or as an agent.

177.

Williams said that she would come as an agent.

178.

Birkhead called Birty and told Birty what Birkhead and Williams had decided.


**Events of Wednesday, April 8, 2020**

179.

On this date, Birty called Williams.

180.

In this conversation, Birty told Williams that he had talked to Birkhead and that Birty understood that Williams would be coming to Jackson as an agent.

181.

Birty said that he was still working on getting Williams reinstated.

182.

Birty said that if Williams was going to Jackson as an agent, that Williams would have to submit a letter stating that Williams was voluntarily stepping down from management and that she would remain with Bankers as an agent.

183.

Birty also said that he was coordinating with Lemmon so that Williams could pick up her personal property from the Baton Rouge office.

184.

After this conversation, Williams decided that she did not want to step down from management.

185.

On this same date, Williams called Birkhead.

186.

Williams told Birkhead that she had thought about everything and that she wanted to stay in management and that she wanted to come to Jackson and help Birkhead.

187.

Birkhead replied: Good for you, you've come to your senses. Birkhead named agents that he would assign to Williams.

188.

Birkhead said that he would call Birty and let Birty know that Williams was coming to Jackson as a USM.

189.

Birkhead also said that a financial package probably won't happen. Williams was surprised to hear that because she knew that every USM gets a one year financial package when going to a new office to help with management.

**Events of Thursday April 9, 2020**

190.

On this date, Williams' access to Bankers website was restored.

191.

As of the date of filing this complaint, there is no written confirmation that Williams employment was ever reinstated.

## Events of Thursday April 16, 2020

192.

On this date, Williams arrived at the Jackson Mississippi office at 9:00 a.m.

193.

Birkhead introduced Williams as the USM transferred from Baton Rouge.

194.

Williams spoke to the group and expressed her pleasure to be working with them, helping them to grow their business and to reach their goals.

195.

Later, Birkhead came into Williams' office and said that he will not put current agents in Williams' downline.

196.

Birkhead said that he will assign new agents to Williams once new agents are hired.

197.

Birkhead said that he and Lemmon are friends and they talk every day and they even sit together when they go to company managers' meetings.

198.

Williams spent the rest of the day trying to be positive, but she was emotionally broken.

## Events of Tuesday, April 21, 2020

199.

On this date, Williams sent a letter to Birty regarding her feelings of being discriminated against. The following is the verbatim text of the letter:

As an African American 62-year-old female, I spent the last 15years at Bankers Life turning the other cheek, and looking away from discrimination, even when it was painful to do so. Today I am very discouraged and disappointed at my current situation which is very unfair and unequal. I feel discriminated against because I am a black 62-year-old female.

I requested a transfer from Baton Rouge, Louisiana to work in Flowood Mississippi office on March 8, 2020 and it was a hard struggle for me to go through all of the negative side effects and problems that occurred because of my request. As you already know, my manager refused to allow a smooth transfer but instead he fired me on April 2, 2020 after he performed several acts of retaliation. I am appreciative that I was reinstated back as a unit sales manager with the same title on April 9th

• I lost income because of the stress and distractions and I still feel that I am being punished and treated unfairly.

Other managers in the past have transferred from one branch to another branch in another state and received financial help and offered a package to build a team from zero to an agreed upon normal goal, or to help grow an existing team. In 2016 a manager transferred to Louisiana from Atlanta and was given a financial package to help manage a small team. I have not been offered anything.

I went from 18 agents in my downline and on my team February 2020 in Baton Rouge, to ZERO agents in my downline in Flowood, as of today, April 22, 2020, I am a manager with no one to manage. I was earning about $4000-$4,500 a month as my override from my team in Baton Rouge and now I am back to square one earning ZERO. I only get paid on my personal production, which has suffered tremendously since the issues associated with this transfer. My physical health is also being affected by this unfair and unnecessary stress.

To add insult to my injury, I cannot contact any clients of l5 years of working in Louisiana. My phone rings every day from someone that knows me as an insurance agent with Bankers Life and they need help. My hands are tied without options. I am losing money; Bankers Life is losing money and l have not been offered a split option if I refer those clients or prospects to another agent. It appears that everyone would

rather lose the business than give me any opportunity to continue to support my livelihood. My client contact list went from 800+ to ZERO. I cannot pull up any clients in my database search. Even my personal insurance policies written on me and my family have all been blocked. In summary, it is unfair and discriminating to expect me to build my business back from scratch, function as a manager and leader with no one to lead yet show up to the office and remain positively motivated. Other USM managers have had help. What makes me different?

200.

A few days later, Birty emailed Williams to notify her of a conference call with himself and Michele Fry on Monday  April 30, 2020. Fry is a CNO Human Resources  employee.

**Events of  Thursday April 30, 2020**

201.

At 10:00 a.m. Williams spoke with Fry and Birty on a conference call to discuss her letter. Williams was emotional but clearly expressed to Fry and Birty all that she had gone through since requesting information about a transfer.

202.

Williams stated that her present situation of being USM without a team was a setup for failure. Williams said that Daniel Daughty moved from Atlanta to Baton Rouge and got the whole team of agents plus a financial package of a guaranteed base pay for one year.

203.

Fry said that Daughty was given a promotion and that Williams moved on her own accord and was not asked to move.

204.

Birty said that Birkhead did not have authority to offer Williams a financial package.

205.

Williams felt insulted because the procedure is that the BSM(Birkhead) starts the paperwork to offer financial support for one year and he sends it to his boss, Perron Shoemaker, and then to Birty for final approval.

206.

Fry asked Williams to forward her a couple of emails that Williams had referred to on the call. Williams forwarded the two emails where she asked HR for instructions on requesting a transfer.

207.

Williams was hoping that something would be done immediately but nothing happened.

## Events of Sunday May 3, 2020

208.

On this date, Williams called a co-worker who had been with Bankers for forty years. This person told Williams that Bankers can do whatever they want to do for their friends. He said that people transfer for personal reasons without a problem and receive financial packages. He told Williams that Ronald Moore was a USM who wanted to transfer from another state to Jackson, Mississippi because his mother was ill. Moore went to Jackson and interviewed with the BSM and was given a financial package of one year base pay and every agent in the office was on his team and in his downline.

## Events of Monday May 4, 2020

209.

On this date, Williams had an emotional breakdown. She could not stop crying. The playbook report shows every manager's performance and their team numbers. Williams was always proud of her past reports. The current report showed

her name with only one agent assigned to her. Williams went from eighteen agents in Baton Rouge to one agent in Jackson.

210.

Williams felt humiliated depressed and discriminated against. Williams experienced stomach pains, headache and sadness causing an emotional breakdown.

211.

Williams searched for health care providers and located DeAnn Johnson and Robin Merrero.

212.

Williams called her doctor, Eric Frusha. Doctor Frusha wrote a prescription for Prozac and advised Williams to see a psychiatrist for followup.

**Events of Wednesday, May 6, 2020**

213.

At 9:00 a.m., Williams spoke with Doctor DeAnn Johnson. Doctor Johnson diagnosed William's condition as a Major Depressive Disorder which was directly related to the events occurring in the workplace as described in this complaint.

214.

Doctor Johnson's recommended course of treatment  for Williams was as follows:

1.   Williams should take a leave of absence from work from May 6, 2020 until at least October 1, 2020;

2.   Williams should treat with Doctor Rachamillu, a psychiatrist for medication management;

3.   Williams should engage in intensive outpatient program("IOP") at Jefferson Oaks Behavioral Health;

4.   Recommended a video to watch on Ted Talk Brena Brown;

5.   Recommended a book on being mentally strong and  other helpful treatments.

**Events of Thursday, May 7, 2020**

215.

Williams had a session with Robin Merrero. Williams cried a lot during this session.

216.

Merrero recommended that Williams meet with her on a weekly basis.

217.

The weekly meetings with Merrero continued until August 6, 2020.

## Events of Friday May 8, 2020

### 218.

Williams consulted with an attorney and began the process to file a charge of discrimination by completing and signing the EEOC Uniform Intake Questionnaire.

### 219.

Williams' attorney transmitted the Intake Questionnaire signed by Williams to the New Orleans office of the EEOC.

## Events of Monday May 18, 2020

### 220.

On this date, Williams broke the little toe on her left foot. Williams' doctor put a boot on her left foot, gave her a set of crutches, and an excuse from work for six weeks.

## Events of Tuesday, May 26, 2020

### 221.

George Floyd, an African American man, was killed by white police officers in Minneapolis, Minnesota. One white police officer  held his knee on Floyd's neck until Floyd died. Several other white police officers stood by and watched and did nothing.

222.

Williams was emotionally impacted by this event. Williams believed that Lemmon held his knee on her neck, trying to kill her, while other white men (Loos, Birty, Cooper, Birkhead, Goldberg, Shoemaker) stood around and watched.

223.

Williams had a very hard time coping with the riots and news media following the death of George Floyd.

224.

Williams realized that she could never go back to work for Bankers. Williams knew that she would have a hard time getting back out in the world. Williams was filled with hate for everyone.

**Events of Monday,  June 1, 2020**

225.

Gary C. Bhojwani, the Chief Executive Officer of CNO,   sent out an email to all employees and agents of CNO and its subsidiaries, including all Bankers agents and employees,   with a letter stating the following:

1.   Like other people of color, he too has experienced racism and prejudice;

2.   He is brokenhearted by the death of George Floyd;

3.     We stand together in support of our colleagues and customers who are black, African Americans and people of color;

4.     We must condemn injustice;

5.     We must use our platform to stand against racism, bias and discrimination;

6.     We must make change and give real voice to Black Americans;

7.     We must join together to change the system that oppresses and discriminates.

226.

Bhojwani also admitted:  I do not really understand systemic discrimination and oppression.

**Events of Friday, June 5, 2020**

227.

Scott Goldberg, President of Bankers, sent an email to all Bankers employees and agents which stated:

1.     I add my voice to condemn racism, injustice ......

2.     We can do better as a company to fight racial injustice wherever it lives.

## Events of June 6-August 26, 2020

228.

Williams continued to be depressed, was unable to sleep at night, and was also suffering with headaches and stomach pains. William's list of medications include:

Medications prescribed by Williams' primary care physician

1. Amlodipine 10mg            for High blood pressure
2. Terazosin 2mg             for High blood pressure
3. Atorvastatin 10mg          for cholesterol
4. Aspirin 81mg
5. Cyclobenzaprine 50mg      as needed for muscle relaxer
6. Mobic 7.5mg               as needed for back pain
7. Latanoprost 0.005          eye drops each night

Medications prescribed by Williams' psychiatrist, counselors, emergency room physician

1. Fluoxetine 20mg           for depression
2. Dicyclomine 20mg          for upset  stomach
3. Amitriptyline 25mg         for sleeping
4. Protonix 40mg             for upset stomach
5. Bupropion HCL 150mg       for anxiety
6. Ondansetron               as needed for Nausea/vomiting
7. Zoloft 50mg               depression

## Events of August 27, 2020

229.

Williams saw the video of Jacob Blake being shot seven times by a police officer in Kenosha, Wisconsin.

230.

Williams related this event to what had happened to her at the hands of Bankers/CNO employees. Williams had a tearful meeting with Dr. Johnson that week.

231.

Williams was trying to walk away (transfer) and kept getting shot in the back and mistreated. Williams felt pain from knowing that thousands of people in Louisiana, Bankers clients, Bankers agents, friends and family would know of her demise. Williams believed that she was losing the respect which she had earned in the fifteen years that she had worked for Bankers/CNO.

232.

Williams told Dr Johnson that she was having the same stomach pain that she experienced when she was on conference calls with Lemmon and Loos.

233.

Williams was an inpatient at Jefferson Oaks Behavioral Center from September 14, 2020 through January 19, 2021. Williams was in therapy three days a week from 9:00 a.m. to 4:00 p.m.

234.

In November 2020, Bankers notified Williams that her FMLA benefits would end and Williams stated that per advice of her doctor that she would be unable to return to work.

235.

Williams is currently receiving long term disability benefits until August 2022.

**EVIDENCE OF SYSTEMIC DISCRIMINATION**

236.

Bankers/CNO made numerous false statements in the Position Statement which Bankers/CNO provided to the EEOC. Bankers/CNO also withheld relevant evidence from the EEOC.

237.

On March 9, 2020, Debra Williams requested written instructions on the transfer process on March 9, 2020. Bates document 1.

238.

To this date, Bankers/CNO have not provided either Debra Williams or the EEOC with the written transfer process. So the written transfer process, if it does exist, remains a mystery. Discrimination flourishes in the presence of mystery.

239.

Bankers/CNO said in its EEOC Position Statement that in the conversation on March 9, 2020, Lemmon and Loos told Williams that there was no open position at the Jackson branch. This is not true. The USM position was open.

240.

Bankers/CNO said in its EEOC Position Statement that Loos and Lemmon told Williams on March 9, 2020 that her request to transfer was denied. Although it is true that Loos and Lemmon made this statement, it is misleading.

241.

On March 9, 2020, Williams requested information about the transfer process.

242.

On that same day, Loos and Lemmon failed to provide Williams with accurate information about the transfer process.

243.

On that same day, Bankers/CNO claimed in its EEOC Position Statement that Williams had failed to obtain the necessary approvals to effect a transfer to the Jackson Branch.

244.

Loos and Lemmon effectively bootstrapped Williams' request for information about the transfer process into a request for a transfer and then told Williams that her request for information about the transfer process/request for transfer was denied.

245.

Loos and Lemmon had no authority to tell Williams that her request to transfer was denied prior to providing Williams with accurate information about the transfer process.

246.

Bankers/CNO said in its EEOC Position Statement that in the March 9, 2020 conference call with Williams, Lemmon and Loos, Loos explained the transfer process and that the transfer request would have to be approved by Lemmon and that there would be a conference between Lemmon, Shoemaker and Birkhead. If this is true, why would Cooper later direct Williams to contact Shoemaker?

247.

Bankers/CNO said in its EEOC Position Statement that Lemmon met with Williams on March 10, 2020 to discuss her transfer request. Why would Lemmon meet with Williams about a transfer request if the transfer request had already been denied?

248.

Bankers/CNO said in its EEOC Position Statement that after Lemmon met with Williams, Lemmon called Cooper to **confirm Lemmon's understanding of the transfer process.** Why would Lemmon have to call anyone about the transfer process? Didn't Lemmon understand the transfer process prior to speaking to Williams? Why isn't the transfer process in writing?

249.

Bankers/CNO said in its EEOC Position Statement that on March 12, 2020, Lemmon spoke to Williams and asked Williams **if she had decided whether to remain a USM in the Baton Rouge Office or transfer to the Jackson Branch as an agent.** This statement contradicts what Lemmon and Loos both said in their March 9, 2020 emails-Williams could not transfer to Jackson under any circumstances.

250.

Bankers/CNO said in its EEOC Position Statement that on March 19, 2020, Cooper reiterated that Williams needed to speak with, and obtain the approval of the branch managers, Lemmon and Birkhead, the other Regional Director Perron Shoemaker, and Human Resources.

251.

In this statement, Cooper directly contradicts what Loos and Lemmon said to Williams in their telephone conference call and confirmed in their followup emails on March 9, 2020-Williams could not transfer to Jackson under any circumstances.

252.

Williams' recollection of this conversation is that Cooper **told her that she was in good standing and there is nothing to prevent me from transferring.** Williams Narrative of Events page 6.

253.

Further, Cooper knew on March 9, 2020 that Williams was requesting information about the transfer process. Cooper, Loos and Lemmon had already misread Williams' intentions. As the Regional Director over the Baton Rouge branch, Cooper had a say in Williams' transfer request. Why did Cooper wait ten days to tell Williams about the transfer process?

254.

In his self-serving email to Loos, Cooper claimed to **have respect** for Williams and to **have a long standing relationship** with Williams and to have a hope of **uncovering another motive and salvaging her career…**

255.

In its EEOC Position Statement, Bankers/CNO embellished Cooper's March 19, 2020 email to Loos. Cooper never told Williams **that a transfer between branch sales offices is not automatic** nor did Cooper specifically tell Williams that **she needed to speak with, and obtain the approval of, Mr. Lemmon, Mr. Birkhead, Regional Director Perron Shoemaker, and Human Resources.**

256.

Cooper himself contradicted this allegation in his email to Loos on March 19, 2020:**…the appropriate protocol would be to inform her BSM that she would be reaching out to the Regional Director to request a transfer…**

257.

After speaking to Cooper on March 19, and after having hopefully heard from someone in authority about what she should do to request a transfer, Williams sent an email to Perron Shoemaker as instructed by Cooper. Bates document 17.

258.

In its EEOC Position Statement, Bankers/CNO denied that Cooper directed Williams to contact Shoemaker.

259.

Shoemaker called Debra Williams later that same day.    Shoemaker told Williams that Cooper had said good things about her and that Shoemaker was looking forward to interviewing Williams in his Memphis office.    Narrative of events page 6.

260.

In its EEOC Position Statement, Bankers/CNO is now saying that, in this same conversation, Shoemaker …told her he did not have a USM role, or any management role for her but stated she could transfer to the Jackson Branch as an agent.

261.

If this is true, that should have been the end of the matter.    Yet  Williams' phone records show phone conversations with Shoemaker on March 19, March 24, March 31,  April 1, and  April 2.  Again, if Shoemaker had told Williams on March 19 that there was no USM role for her in Jackson,  there would have been no reason for the two of them to engage in four subsequent telephone conversations. There

would have been no reason for Williams to continue to call or talk to Shoemaker if Shoemaker had already rejected her transfer request.

262.

To the contrary, Williams' April 2 email to Cooper, her April 2 text message to Scott Goldberg, and her April 6 letter to Robert Birty all stated that she contacted Shoemaker at Cooper's direction. Bates documents 20, 22-25, 29-31.

263.

If Cooper did not "direct" Williams to contact Shoemaker, then why didn't Cooper dispute Williams' April 2 email which clearly stated: I followed your instructions by reaching out to Perron Shoemaker. Bates document 20.

264.

If Cooper did not "direct" Williams to contact Shoemaker, why didn't Cooper mention that in his email to Loos on March 19?

265.

If Cooper did not "direct" Williams to contact Shoemaker, wouldn't Shoemaker know the proper procedure? Wouldn't Shoemaker complain to someone that Williams wasn't following the "protocol"?

266.

On March 19, 2020, Williams located a form for transfer request on the Bankers website. Williams followed the instructions to complete the form and sent

the transfer request to the Territory Office Administrator, Laura Carbone. Williams also copied Lemmon and Birkhead. Bates document 16.

267.

This transmission prompted Loos to quiz Williams about the origin of the form. Williams told Loos that she found the form on the Bankers/CNO website.

268.

Obviously Loos, in his capacity as the CNO Human Resources Director, did not know where to locate the form at the time Williams completed the form nor could Loos or anyone in his department locate the form at anytime prior to the lawyers becoming involved in the case.

269.

Loos had not located the form prior to citing Williams' use of the form as a ground for Williams' termination in the conversation which took place on April 2, 2020.

270.

Once Bankers/CNO retained counsel, the source of the form was identified as a legitimate internal Bankers/CNO document.

271.

In its EEOC Position Statement, Bankers/CNO alleges that Williams forced Bankers/CNO to create a management position for her in another office.

Bankers/CNO also alleges that it created a position to allow Williams to transfer for personal reasons from one branch to another. These allegations are false.

272.

When  Jeremy Loos,  CNO's Human Resource manager, learned of Debra Williams interest in transferring to the Jackson, Mississippi branch as a Unit Sales Manager ("USM"), he told  Williams: **there's not a role for you to transfer into where you are going**. Bates documents number 8 Loos email dated March 9, 2020.

273.

Loos' statements to Williams are false for two reasons:

a)    Bankers  business  model  provides  for  at  least  one  Unit  Sales Manager (USM) at each business location;

b)    Bankers never advertises USM openings.

274.

Bankers'  business  model  provides  for  at  least  one  Unit  Sales Manager("USM") in each of its branch offices.  Bankers playbook report. RR 1 is an internal Bankers document dated October 28, 2020.  The Columns on the report show the name of the branch office, the USM, and information about each agent assigned to each USM in each branch office.  The Baton Rouge office is branch 4062.  Williams is the USM and 15 agents are working under her supervision.

275.

The report clearly and unmistakably shows that the Jackson office organization is no different from any other Bankers branch. The Jackson office had 13 active agents and no USM at the time Debra Williams expressed interest in transferring to Jackson as a Unit Sales Manager. RR 2.

276.

Bankers does not advertise for openings in USM positions. RR3 is a screenshot of the Bankers website on October 28, 2020 showing an icon entitled:

Current Job Postings

No Current Openings

277.

Yet on that same date, there were four open USM positions: Branch # 4015 Tyler TX(RR1); Branch # 2065 Jackson MS(RR 2); Branch # 5063 Pocatello ID(RR 4); Branch # 3055 Belleville IL(RR5).

278.

One of the clearest indicators of illegal discrimination is misrepresentation and deceit. There was an open USM position at Branch #2065 Jackson MS at the time Williams expressed an interest in transferring to that location. The Territory Vice President, Robert Birty, stated that he did not understand why Tom (the Jackson Branch Manager) would not want Williams' help. Narrative of events page 12.

279.

On March 9, 2020, Williams was a successful USM at the Baton Rouge branch. Williams wanted to relocate to Mississippi to be closer to her family. There was an open USM position at the Bankers/CNO Jackson, Mississippi office.

280.

Bankers/CNO never provided Williams with accurate information about the transfer process either at the time Williams first inquired about the transfer process on March 9, 2020 or at any time subsequent to that date. As of the date of filing this complaint, the transfer process for employees similarly situated to Debra Williams on March 9, 2020 remains a totally subjective mystery.

281.

Bankers/CNO denied Williams the opportunity to make an informed decision about the possibility of transferring to the open USM position at the Jackson, Mississippi branch office because of illegal discrimination.

282.

Lemmon and Loos conspired among themselves and with others to discourage Williams from transferring to the Jackson office.

283.

When that scheme failed, Lemmon and Loos then manufactured charges of employee misconduct-leaving the office without prior approval, suspicion of theft of company property- and the following reasons mentioned in the April 2, 2020 telephone conference:

      a)    Williams did not provide the link from the website;

      b)    Williams lied about her conversation with Birkhead;

      c)    Williams sent a false email to Carbone;

      d)    No position was available in Jackson;

      e)    Williams was disregarding their directions.

284.

Birty proved that all of these alleged incidents of employee misconduct were false when Birty reinstated Williams' employment.

285.

Lemmon, Loos and others also conspired to create a hostile work environment for Williams in retaliation against Williams because Williams requested information about the transfer process as described in this statement of fact and also by deliberately undermining Williams' authority over agents assigned to her in the Baton Rouge office.

## FIRST CAUSE OF ACTION
## TITLE VII VIOLATION

286.

Defendants discriminated against plaintiff in violation of Title VII by failing to provide accurate information about the transfer process on the same terms and in the same manner as defendants would have provided to a similarly situated male employee.

287.

Defendants discriminated against plaintiff in violation of Title VII by failing to afford plaintiff the same consideration of plaintiff's desire to transfer as defendants would have afforded to a similarly situated male employee.

288.

Defendants discriminated against plaintiff in violation of Title VII by failing to provide accurate information about the transfer process on the same terms and in the same manner they would have provided to a similarly situated white employee.

289.

Defendants discriminated against plaintiff in violation of Title VII by failing to afford plaintiff the same consideration of plaintiff's desire to transfer as defendants would have afforded to a similarly situated white employee.

290.

Defendants discriminated against plaintiff in violation of Title VII by subjecting plaintiff to harassment which unreasonably interfered with the work environment and which created an intimidating, hostile, and offensive work environment for no other reason than to deny plaintiff the same employment opportunity which defendants make available to defendants' white male employees.

291.

Defendants acted with reckless disregard to plaintiff's legally protected rights and are therefor liable for punitive damages as provided by law.

292.

All of the acts of defendants as alleged in this complaint are the proximate cause of plaintiff's injury and plaintiff is therefore is entitled to compensatory damages, back pay, benefits, reinstatement, front pay, reasonable attorney fees, and court costs as provided by law..

**SECOND CAUSE OF ACTION**
**RETALIATION**
293.

Defendants retaliated against plaintiff by terminating plaintiff's employment for pretextual reasons after plaintiff complained of illegal discrimination.

294.

Defendants retaliated against plaintiff by failing to provide accurate information about the transfer process after plaintiff complained of illegal discrimination.

295.

Defendants retaliated against plaintiff by failing to afford plaintiff financial compensation and responsibility commensurate with plaintiff's position as the USM of the Jackson, Mississippi branch.

296.

All of defendants' negative employment actions directed against plaintiff came after plaintiff complained of illegal discrimination.

297.

All of the acts of defendants as alleged in this complaint are the proximate cause of plaintiff's injury and plaintiff is therefore is entitled to compensatory damages, back pay, benefits, reinstatement, front pay, reasonable attorney fees, and court costs as provided by law.

## THIRD CAUSE OF ACTION
## ADA VIOLATION
298.

Defendants violated the Americans with Disabilities Act of 1990, 42 USC § 12101 et seq  because the plaintiff was in the protected group, was qualified to do, and was doing the work in a satisfactory manner, and was subjected to adverse employment action  taken by defendants.

299.

Defendants' adverse employment action against plaintiff was effectuated by one or more of the following illegal acts:

a)  the defendants limited, segregated, or classified the plaintiff in a way that adversely affected the plaintiff's opportunities or status because of the disability of the plaintiff;

b) the defendants utilized standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability, or

that perpetuate the discrimination of others who are subject to common administrative control;

c) the defendants failed to make a reasonable accommodation to the plaintiff's    known physical or mental limitations;

d) the defendants terminated plaintiff's employment because the defendants regarded the plaintiff as disabled;

300.

All of the acts of defendants as alleged in this complaint are the proximate cause of plaintiff's injury and plaintiff is therefore is entitled to compensatory damages, back pay, benefits, reinstatement,  front pay, reasonable attorney fees, and court costs as provided by law.

**THIRD CAUSE OF ACTION**
**ADEA VIOLATION**
301.

Defendants violated the Age Discrimination in Employment Act, 29 USC § 621 et seq. because the plaintiff was in the protected age group, was qualified to do, and was doing the work in a satisfactory manner, was subjected to adverse employment action by defendants in a manner consistent with an unwritten policy to  favor persons younger than forty years of age, and defendants were  motivated to act because of plaintiff's age.

302.

Defendants willfully violated   the law and and are  liable to the plaintiff for double damages.

303.

All of the acts of defendants as alleged in this complaint are the proximate cause of plaintiff's injury and plaintiff is therefore is entitled to compensatory damages, back pay, benefits, reinstatement,  front pay, reasonable attorney fees, and court costs as provided by law.

**FOURTH  CAUSE OF ACTION**
**LADEA VIOLATION**
304.

Defendants violated the Louisiana Age Discrimination in Employment Act, L.S.A.-R.S. 23:312  because the plaintiff was in the protected age group, was qualified to do, and was doing the work in a satisfactory manner, and was subjected to adverse employment action because of plaintiff's age.

305.

Plaintiff is entitled to compensatory damages, back pay, benefits, reinstatement, and front pay, reasonable attorney fees, and court costs as provided by L.S.A.- R.S. 23:303.

## FIFTH CAUSE OF ACTION
## LADEA VIOLATION

306.

Plaintiff was in the protected group, was qualified to do, and was doing the work in a satisfactory manner, and was subjected to adverse action because of defendants' violations of the Louisiana Employment Discrimination Law, L.S.A.-R.S.23: 332.A(1)(b).

307.

Plaintiff is entitled to general and special compensatory damages, back pay, restoration of employment related benefits, reasonable attorney's fees, interest and court costs as provided by LSA- RS 23:303. B.

308.

Defendants' adverse employment action against plaintiff was motivated by the following illegal acts:

a) the defendants limited, segregated, or classified the plaintiff in a way that adversely affected the plaintiff's opportunities or status because of the disability of the plaintiff;

b) the defendants utilized standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability, or

that perpetuate the discrimination of others who are subject to common administrative control;

c) the defendants failed to make a reasonable accommodation to the plaintiff's    known physical or mental limitations.

## 309.

Plaintiff is entitled to compensatory damages, back pay, benefits, reinstatement, reasonable attorneys fees, interest and court costs as provided by L.S.A.-R.S.23:303.

## 310.

Plaintiff's charge which was filed with the EEOC satisfies the notice requirement of L.S.A.-R.S. 23:325. C.

## PRAYER FOR RELIEF

WEREFORE plaintiff prays that this court:

(1)    Declare that the employment practices complained of are unlawful;

(2)    Permanently enjoin the defendants, their agents, officers, and employees   from engaging in all practices found by the court to be in violation of the law;

(3)    Order reinstatement of the plaintiff, together with an award of all salary, benefits, seniority, and all other employment emoluments plaintiff

would have received absent unlawful discrimination from the date of termination until time of trial; or

(4)     In lieu of reinstatement, that the court award:

    (a)     backpay from date of termination to time of trial;

    (b)     front pay;

    (c)     future loss of earnings and

    (d)     compensatory damages, general damages, punitive damages, and

    and all other relief available under applicable federal and state law;

(5)     Order the defendants to make the plaintiff whole by paying such monetary and non-monetary benefits in amounts to be proved at trial but in all events, more than Ten Thousand Dollars($10,000.00);

(6)     Retain jurisdiction over this action to insure full compliance with the Court's orders, and require the defendant to file such reports as the Court deems necessary to insure compliance;

(7)     Order the defendants to pay plaintiff's costs and expenses and reasonable attorneys' fees as provided by law;

(8)     Award pre-judgment interest as provided by law;

(9)     Grant such other and further relief to the plaintiff as the Court deems just and proper.

(10)    Grant a trial by jury.

/s/ Joshua P. Clayton

_____

**CLAYTON LAW FIRM, LLC**
Joshua P. Clayton, LSBA No. 34488, T.A.
202 Village Circle, Suite No. 2
Slidell, Louisiana  70458
(985) 863-3065 voice
(985) 863-7707 facsimile
E-mail: josh@claytonlawfirmllc.com

HOGAN ATTORNEYS

    /s/ ***Thomas J. Hogan, Jr.***

_____

THOMAS J. HOGAN, JR.
Bar Roll No. 06908
P. O. Box 1274
Hammond, LA 70404
(985)542-7730
thogan4800@gmail.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**DEBRA WILLIAMS**

                                                **CIVIL ACTION**

**VERSUS**

**BANKERS LIFE & CASUALTY COMPANY;**
**CNO FINANCIAL GROUP, INC.**

                                                    **TRIAL BY JURY**

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury.

/s/ Joshua P. Clayton

**CLAYTON LAW FIRM, LLC**
Joshua P. Clayton, LSBA No. 34488, T.A.
202 Village Circle, Suite No. 2
Slidell, Louisiana  70458
(985) 863-3065 voice
(985) 863-7707 facsimile
E-mail: josh@claytonlawfirmllc.com


HOGAN ATTORNEYS

/s/ **_Thomas J. Hogan, Jr._**

THOMAS J. HOGAN, JR.
Bar Roll No. 06908
Attorney for Plaintiff
P. O. Box 1274
Hammond, LA 70404
(985)542-7730
thogan4800@gmail.com


**PLAINTIFF WILL REQUEST DEFENDANTS WAIVE SUMMONS**